UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES                    :

V.                               :    CASE NO. 3:07-cr-298(RNC)

KEVIN CROSLEY                    :


RULING AND ORDER

This case is before the Court on the defendant's motion to suppress.  For reasons that follow, the motion is denied.

I.  FACTS

The evidence at the suppression hearing establishes the following.

On November 27, 2007, at about 10:20 a.m., the Norwalk Police Department received a telephone call from a female resident of Washington Village, a public housing complex in South Norwalk.  The caller reported that a group of five or six black males were dealing drugs outside her apartment in the walkway between buildings 100 and 200, a known "hot-spot" for drug dealing by persons who did not live in the complex.  The suspects were described as wearing dark-colored hooded sweatshirts with the hoods up.  According to the caller's report, people in the walkway were smoking drugs and the smoke was wafting into her apartment.  Officers Paul Larsen and Maggie Thompson were on patrol duty in South Norwalk at the time.  Larsen was in a cruiser around the corner from the location in question.  Thompson was in a cruiser a few minutes away.  Both were

dispatched to the housing complex to respond to the resident's
complaint.

Officer Larsen responded immediately.  Proceeding in a
southerly direction on Day Street, he passed the 200 block of the
housing complex, where building 200 is located, and saw no one.
As he approached the 100 block, he saw the defendant exiting the
housing complex on the south side of building 100 at a brisk
pace.  The defendant was wearing a dark blue hooded sweatshirt
with the hood up.  Officer Larsen, an experienced patrol officer
who knew the area well, suspected that the defendant might be one
of the persons who reportedly had been dealing drugs between
buildings 100 and 200.

Officer Larsen put his window down and called out to the
defendant.  He did this in a low-key manner because he did not
want the defendant to flee.  The defendant approached the
cruiser.  The defendant was asked to give his name, which he did.
The officer asked whether the defendant lived at the housing
complex.  The defendant said no and added that he had been
visiting a friend.  According to the officer's testimony, which I
credit, the defendant was jittery and nervous and soon blurted
out that he had recently paid a ticket for trespassing at the
housing complex.  The officer asked the defendant for
identification and the defendant said he had none.  The officer
used his radio to conduct a warrant check on the defendant and

2

confirmed that he was not the subject of any outstanding arrest warrants.

Officer Larsen then got out of his cruiser intending to place the defendant under arrest for criminal trespass in the third degree.  He grabbed the collar of the defendant's sweatshirt, put him against the cruiser and ordered him to put his hands on the roof, which the defendant did.  As the officer reached with his left hand to get his handcuffs, the defendant twisted out of the sweatshirt and ran away.  Officer Larsen used his radio to report that the defendant had fled and was running toward South Main Street.

Officer Thompson was nearby in her cruiser when she heard Officer Larsen's report.  She knew that the fleeing suspect's path would take him through an alley adjacent to South Main Street and pulled into the alley to intercept him.  The defendant soon appeared.  He was running but immediately slowed to a walk when he saw Officer Thompson's cruiser.  It was apparent to the officer that the defendant was trying to make it appear that he had not been running.

Officer Thompson concluded that the defendant was the suspect who had just fled from Officer Larsen and therefore ordered him to stop.  He responded by running away.  Officer Thompson ran after him and saw him trying to crawl under a parked truck.  She grabbed his legs and detained him until other

3

officers arrived.  A search of the defendant's person disclosed marijuana and cocaine.  A loaded gun was also recovered. These are the items the defendant has moved to suppress.

II.  DISCUSSION

The defendant claims that Officer Larsen seized him in violation of the Fourth Amendment and that the drugs and gun must be suppressed because they are the fruit of the allegedly unlawful seizure.  I disagree.  Officer Larsen's actions, objectively viewed, were adequately supported by reasonable suspicion that the defendant was engaged in drug dealing. Moreover, the causal connection between the initial seizure of the defendant by Officer Larsen and the acquisition of the drugs and gun by other officers is sufficiently attenuated to make the evidence admissible at trial.[1]

When Officer Larsen grabbed the defendant by his sweatshirt, put him against the cruiser and ordered him to put his hands on the roof, he seized the defendant's person.  See California v. Hodari D., 499 U.S. 621, 625-26 (1991)(seizure occurs when

---

[1]  The location of the gun at the time it was recovered by the police is unclear.  The evidence indicates that it was found somewhere in the vicinity of the truck rather than on the defendant's person or within his immediate reach.  In view of this, it is distinctly possible that the defendant abandoned the gun while attempting to escape, in which case the gun is clearly admissible.  See California v. Hodari D., 499 U.S. 621, 629 (1991).  But the government does not make this argument.  For purposes of this ruling, therefore, I assume that the gun was not abandoned.

4

officer applies physical force even though suspect does not
yield).  The officer's actions, although intended to effect an
arrest, did not exceed the scope of a patdown search for weapons,
which the officer was entitled to conduct if he reasonably
suspected that the defendant was engaged in drug dealing.  See
Terry v. Ohio, 392 U.S. 1, 21 (1968).  The circumstances known to
Officer Larsen provided reasonable suspicion that the defendant
was engaged in drug dealing.  The defendant's location in close
proximity to the "hot-spot" between buildings 100 and 200 where
drugs reportedly were being openly sold and smoked just moments
earlier, his appearance (which fit the description of the
suspects provided by the caller), his obvious nervousness when
responding to the officer's questions, his admission that he did
not live at the housing complex, his exclamation that he had
recently paid a fine for trespassing, and his lack of
identification, considered in the aggregate, provided objective
justification for investigating further and conducting a safety
search.[2]

Even assuming Officer Larsen's conduct violated the Fourth
Amendment (because his seizure of the defendant either lacked

---

[2]  The government contends that the officer had probable
cause to arrest the defendant for criminal trespass in the third
degree.  If the government is correct, the seizure was lawful
even if it constituted an arrest.  I do not think the officer had
probable cause, however.  In my view, the officer could not
arrest the defendant for trespassing without first following up
on the defendant's claim that he had been visiting a friend.

reasonable suspicion or constituted an arrest lacking probable cause), the drugs and gun need not be suppressed.  A court may admit evidence that would not have been obtained by the government but for a constitutional violation if the causal connection between the violation and the acquisition of the evidence is sufficiently attenuated.  See Wong Sun v. United States, 371 U.S. 471, 477-88 (1963).  Factors to consider are: the time elapsed between the violation and the acquisition of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the violation.  See Brown v. Illinois, 422 U.S. 590, 603-04 (1975).

In this case, the causal connection between Officer Larsen's allegedly illegal seizure of the defendant and the discovery of the items at issue is sufficiently attenuated by the presence of intervening circumstances.  The defendant's flight from Officer Larsen provided "strong indicia of mens rea." Sibron v. New York, 392 U.S. 40, 66 (1968); see Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000)("headlong flight" is "consummate act of evasion").[3]  When Officer Thompson told the defendant to stop, she believed that he was fleeing from Officer Larsen.  Her belief was clearly reasonable considering the defendant's location (he was exactly where she expected the fleeing suspect to be),

---

[3]  The defendant's flight from Officer Larsen might well have constituted a crime under Connecticut law but the government does not make this argument.

6

appearance (he fit the description of the suspect - a black male wearing dark clothing) and notably suspicious behavior (he stopped running when he saw her, slowed to a walk and tried to make it seem like he had not been running).  The defendant's renewed flight in response to the order to stop provided adequate justification to pursue and detain him.  See Kolender v. Lawson, 461 U.S. 352, 366 n. 4 (1983)(Brennan, J., concurring)(flight in reaction to investigatory stop may "provide the necessary information, in addition to that the officers already possess, to constitute probable cause").  The subsequent search of his person was lawful either as a safety search or a search incident to arrest.

III. CONCLUSION

Accordingly, the motion to suppress is hereby denied.

So ordered this 2nd day of March 2009.

/s/ RNC

Robert N. Chatigny
United States District Judge
